UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

KERRY CONNOLLY,

                    Plaintiff,

    - against -

PEERLESS INSURANCE COMPANY,

                    Defendant.

-----------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**

CV 10-0789 (ADS)

**A P P E A R A N C E S :**

    **BRACKEN MARGOLIN BESUNDER LLP**
    Attorneys for Plaintiff
    1050 Old Nichols Road, Suite 200
    Islandia, NY  11749
    (631) 234-8585
    By: Patricia M. Meisenheimer, Esq.
       Of Counsel

    **JAFFE & ASHER, LLP**
    Attorneys for Defendant
    600 Third Avenue, Ninth Floor
    New York, NY  10016
    (212) 234-8585
    By: Marshall T. Potashner, Esq.
       Of Counsel

**SPATT, District Judge.**

    This is a breach of contract action, based on a motor vehicle accident.  The action is by the plaintiff Kerry Connolly ("Connolly" or the "plaintiff") against the defendant Peerless Insurance Company ("Peerless" or the "defendant").  The action is brought to recover Underinsured Motorist Benefits under an insurance policy issued by Peerless with regard to an accident that occurred on October 13, 2007.  In this motor vehicle accident, Connolly was a front seat passenger in a car driven by James Sandnes, her husband, which was stopped for a red light

at an intersection, when it was hit in the rear by a Pontiac motor vehicle operated by Juan

Umana.  The Umana vehicle had an automobile liability insurance policy with GMAC Insurance.

The GMAC insurance policy had a per person policy limit of $25,000.  Connolly settled her

personal injury claim with Umana and GMAC Insurance by receiving the full amount of the

coverage in the sum of $25,000.

Relevant to the issues in this case, Peerless had issued a Personal Protection Policy to the

plaintiff and her husband, James Sandnes, for the period from May 25, 2007 to May 25, 2008

(the "Peerless Policy") .  The Peerless Policy provided Supplementary Uninsured/Underinsured

Motorists ("SUM") benefits, with a $500,000 accident policy limit.  The SUM coverage insuring

agreement provided, in relevant part, as follows:

### II.  Damages for Bodily Injury Caused by Uninsured Motor Vehicles

>       We will pay all sums that the insured or the insured's legal representative
> **shall be legally entitled to recover as damages** from the owner or operator of an
> uninsured motor vehicle because of bodily injury sustained by the insured, caused
> by an accident arising out of such uninsured motor vehicle's ownership,
> maintenance or use, subject to the Exclusions, Conditions, Limits and other
> provisions of this SUM endorsement.  (Emphasis supplied).

The intent and purpose of the SUM coverage as it relates to the No Fault Serious Injury

situation is set forth in the following provision in the "SUM Endorsement":

> This SUM coverage does not apply:

>       3. For non-economic loss, resulting from bodily injury to an insured and
> arising from an accident in New York State, unless the insured has sustained
> serious injury as defined in Section 5102(d) of the New York Insurance Law.

So that up to the policy limits of $500,000, the Peerless SUM coverage fills in the gap

between a tortfeasor's own insurance coverage and the amount that the insured recovers as

damages from the tortfeasor.  In this case, the tortfeasor carrier paid to the plaintiff the sum of

$25,000, the total amount of its coverage for this motor vehicle accident.

## I.  THIS MOTION

The defendant Peerless is moving for an order pursuant to Federal Rules of Civil Procedure (Fed.R.Civ.P.) 56, granting Peerless summary judgment, requesting a determination that the plaintiff Kerry Connolly did not suffer a "serious injury" as defined in New York Insurance Law § 5102(d).  The defendant requests that the complaint be dismissed, or in the alternative, "dismissing any claim for recovery of damages because of emotional distress allegedly caused by Peerless' denial of coverage and the time lost by the plaintiff from her practice as an attorney in litigation of this action and for the recovery of any costs incurred (Dft's Memorandum in Support 1).

## II.  THE DEFENDANT'S CONTENTIONS

Peerless contends that the accident that occurred on Saturday, October 13, 2007 was a minor automobile accident in that the plaintiff's vehicle was stopped and the Umana vehicle, insured by GMAC Insurance, "was going less that 4 mph."  (Dft's Memorandum in Support at 3).  The plaintiff's vehicle was not pushed into the intersection; the airbag was not deployed; and the vehicle suffered only minor damage, limited to the rear bumper, muffler and tailpipe.  No one called the police and the police never came to the scene.  After the drivers spoke, the plaintiff and her husband proceeded on their way to a dinner party at a friend's house in Westhampton.  After the dinner party Connolly and her husband drove home in their automobile.

Connolly then went to work, as usual, the following Monday.  Connolly never went to a hospital.  She first consulted Dr. Akifa Samdani on October 18, 2007, five days after the accident.  Dr. Samdani was the only doctor who treated Connolly for injuries related to this

occurrence for at least the first year after the accident. He initially treated the plaintiff for a neck sprain, which was the only pain Connolly was suffering from.

For the first time on a visit to Dr. Samdani on August 14, 2008, ten months after the accident, Connolly complained of pain in the right shoulder which had started in July, 2008, nine months after the accident. At that time, there was no neck pain radiating into the shoulder. On December 2, 2008, Connolly was treated by Dr. Stephen Fealy, "her close personal friend" for the condition of her right shoulder. Her second visit to Dr. Fealy was six months later. Dr. Fealy testified at his deposition that he could not determine if any of her injuries were caused by the auto accident. This opinion is supported by the expert report of David L. Gushue, PHD, a Biomedical engineer, who reconstructed the accident. Gushue determined that the collision would not have caused the injuries claimed by Connolly.

The defendant further contends that, with "likely probability" the injury and pain to Connolly's right shoulder was caused by a weightlifting regime she engaged in prior to and after the accident. Prior to the accident she suffered the same injury to her left shoulder incurred while weightlifting. On May 10, 2007, Dr. Fealy performed an operation on Connolly's left shoulder, very similar to the operation he later performed on Connolly's right shoulder, three years after the accident.

Peerless retained Dr. A. Robert Tantleff, a radiologist, to review Connolly's MRIs. He determined that "any issues" related to Connolly's right shoulder were similar to "the issues" related to her left shoulder and were not causally related to the accident. Dr. Tantleff also determined that the conditions of the plaintiff's spine were "normal degenerative changes," which are age-appropriate and consistent with the individual's age and the normal aging process

4

and "not causally related to the date of the incident . . . requiring years to develop." (Dft's Memorandum in Support at 7, 8). Therefore, the defendant's counsel concludes that "there is no evidence such that the trier of the fact . . . could reasonably determine that Connolly suffered a 'serious injury.'" (Dft's Memorandum in Support at 8).

## III.  <u>THE PLAINTIFF'S CONTENTIONS</u>

Contrary to the defendant's analysis, as to the type of impact in this accident, the plaintiff's counsel states that the Sandnes vehicle was "suddenly struck in the right rear . . . propelling the Sandnes vehicle partially off the ground." (Pltf's Memorandum at 1). Bay Ridge Lexus informed Sandnes that there was extensive damage underneath the vehicle. On October 15, 2007, the first business day following the accident, Sandnes reported to Peerless that Connolly was suffering from back pain. She was given the first available appointment with Dr. Akifa Samdani on October 18, 2007. Connolly complained of right sided neck pain radiating into the shoulder and lower back pain. Dr. Samdani wrote a prescription for physical therapy and made a diagnosis of "whiplash-cervical sprain and trigger pt trapz (trapezuis)". The plaintiff received physical therapy on October 24 and October 30, 2007, for lower back pain. On August 18, 2008, the plaintiff informed Dr. Samdani that the pain in her back by her right shoulder had "moved to an intense pain in front of the shoulder." An MRI of the lumbar-sacral spine on August 29, 2008 revealed a central L5-S1 disc herniation; flattening of the thecal sac; and a L4-L5 disc bulge. Connolly was suffering from intense pain in the front of her right shoulder, diagnosed as right shoulder tendonitis.

On June 18, 2009, twenty months after the accident, the plaintiff had continued low back pain with radiation to her left leg. She also had left arm numbness since the accident. Connolly

underwent physical therapy for the right shoulder from August 20, 2008 through June 25, 2009, a period of ten months.  An MRI performed in June 30, 2009 showed C6-C7 disc herniation.

Further, counsel for the plaintiff asserts that the prior condition of Connolly's left shoulder is unrelated to the injuries sustained in this occurrence.  Counsel also denies that weightlifting caused either shoulder condition, which opinion is explicitly confirmed by Dr. Fealy in his deposition testimony.  After many treatment sessions, on February 25, 2011, under anesthesia, Dr. Fealy performed a right shoulder arthroscopic manipulation; a right shoulder arthroscopic rotator interval capsule release; a right shoulder arthroscopic subacromial decompression; and an acromoplasty.  On April 26, 2011 the plaintiff still suffered from decreased flexion and rotation of the right shoulder.  Dr. Fealy concluded that the car accident of October 13, 2007 was a competent producing cause of Connolly's injuries.  Significantly, Dr. Fealy further testified that Ms. Connolly has suffered permanent injuries as a result of the motor vehicle accident of October 13, 2007.  The range of motion of her right shoulder continues to be limited and certain movements cause pain.  Dr. Fealy also testified that he expects that in the future the plaintiff will have intermittent lack of full range of motion of the right shoulder and unpredictable episodes of pain.  (See Exhibit G - Fealy Declaration).

The plaintiff was also treated by Dr. Christopher Lutz, a physiatrist, for her cervical and lumbar spine conditions.  Dr. Lutz testified that the injuries to Connolly's cervical and lumbar spine were not typically degenerative but rather, as a result of the accident.  In a June 30, 2009 MRI, Dr. Lutz noted a C6-C7 disc herniation and a bulging disc at C3-C4.  He also confirmed that Connolly was suffering from an acute left radiculopathy.

More recently, on March 2, 2011, Dr. Lutz noted that Connolly had cervical spine range

6

of motion restriction, with rotation to the left with end range discomfort, parathesis into the left

upper extremity and only 4/5th strength in the left biceps.  On December 7, 2010 and again on

March 10, 2011, Dr. Lutz performed fluoroscope guided epidural steroid injections with

epiduralgram.  On both procedures he visualized that Connolly had left lower limb and back

symptoms, with injection of the steroid followed by pain relief during the anesthetic phase.

Physical examinations by Dr. Lutz on April 13, 2011, September 1, 2011 and November 9, 2011

revealed pain and restrictions and a positive Dural Tension Sign, which indicated to him that the

plaintiff's condition was not degenerative in nature but instead, resulted from an acute traumatic

injury.

### IV.  TWO DOCTORS WHOSE REPORTS WERE SUBMITTED BY DEFENDANT'S COUNSEL, HAVE CAUSALLY RELATED THE PLAINTIFF'S INJURIES TO THE ACCIDENT

It is customary, in a case involving a claim for personal injuries, for the defending

counsel to request and receive, medical examinations of the claimant by doctors of their choice.

This practice is invariably followed.  The reason, of course, is for the defense to ascertain the

nature and extent of the claimed injuries, and also, to prepare a defense to amelerorate or nullify

the damages.  At first blush, that customary practice was followed in this case.  In its

Memorandum in Support, Peerless states that it retained Dr. A. Robert Tantleff, a radiologist, to

review the Connolly MRIs.

However, in its Memorandum in Support, the defendant pointedly did not mention two

other doctors who examined the plaintiff, ostensibly on behalf of Peerless.  These doctors are Dr.

P. Leo Varriale, an orthopedic surgeon, and Dr. John J. Brennan.  Both of these doctors, were

apparently retained by Peerless or its counsel or some other company or firm associated with

Peerless, to examine the plaintiff and report their findings.  Plaintiff's counsel identifies these two physicians in their Memorandum in Opposition with the words, "Two of defendant's own doctors have verified plaintiff's injuries."  Id. at 10.  The reports of these two doctors were submitted by defendant's counsel to the plaintiff's counsel.

However, strangely, in the defendant's Reply Memorandum of Law, the defendant's counsel states that, "Contrary to Connolly's arguments, neither these two doctors are Peerless employees or agents and neither one of them was retained by Peerless for this action."  (Reply Memorandum at 8).  In order to clarify this mystifying situation, the Court issued a short form order, which provided in part:

> In opposition to the defendant's motion, among a number of arguments, the plaintiff also cites to (1) a report by Dr. P. Leo Varriale, M.D. dated November 16, 2009 (Meisenheimer Decl., Ex. P); and (2) a report by Dr. John J. Brennan, M.D. dated July 14, 2011.  The plaintiff states that these reports are by the defendant's "own doctors", in that the plaintiff was examined by these doctors at the request of the defendant's counsel.  (Pl.'s Opp. at 10).  However, strangely, in its reply memorandum dated December 12, 2011, the defendant states that "Contrary to Connolly's arguments, neither of these doctors are Peerless employees or agents, and neither one of them was retained by Peerless for this action."  (Def.'s Reply Mem. at 8).
>
> *   *   *   *   *
>
> In a personal injury case, these examinations by the defendant's physicians are routine happenings; almost always ordered by the defendant's counsel.  In this case, following these examinations, both doctors rendered reports.  Notwithstanding these apparently established facts, the defendant's counsel now denies that either of the doctors were retained by Peerless and apparently denies that either of the doctors examined the plaintiff for the defense in this action.
>
> The Court requires further clarification with respect to these two medical reports.  Accordingly, the Court directs the parties to each submit a letter by July 3, 2012 at 5:00 pm, not to exceed 2 pages in length, identifying at whose request and for what purpose(s) Drs. Varriale and Brennan examined the plaintiff and provided their written reports; who retained the doctors; who paid their fees; what

8

is claim number 403169680 cited on each report; and what relation to this action is the National Claim Evaluation, Inc. of Jericho, New York, referenced to in the report of Dr. Brennan.  No replies will be accepted.

In response to the Court's Order, the defendant's counsel sent a letter to the Court dated

July 3, 2012.  The letter stated, in part, the following response:

Our firm represent defendant PEERLESS INSURANCE COMPANY ("Peerless") in the above-entitled action.  We send this letter in response to your Honor's Short Order of July 2, 2012.

As an Officer of the Court, I advise that Drs. Varriale and Brennan and National Claim Evaluation, Inc. ("National Claim") were not retained by or on behalf of my firm.  I also confirmed that Peerless' claims unit handling this Supplementary Uninsured Motorist ("SUM") claim did not retain Dr. Varriale, Dr. Brennan, or National Claim.  I also confirm that no one from or on behalf of our firm, and no one from Peerless' claim unit handling this SUM claim, ever communicated with Dr. Varriale, Dr. Brennan, or National Claim regarding plaintiff's claim.

National Claim was retained by Peerless' "No-Fault" claims unit in connection with plaintiff's PIP claim.  National Claim appears to have retained Dr. Varriale and Dr. Brennan.  As a result of plaintiff's HIPPA rights, the "no fault" claim is handled separate and apart from the SUM claim.  They are handled by different claims units to protect plaintiff's HIPPA rights.  The claims unit handling the SUM claim cannot even access the "no-fault" file without a HIPPA release form signed by plaintiff.  Evidencing this separation is the fact that plaintiff, an attorney who represented herself pro se in this action, communicated directly with the "no fault" unit without my permission or knowledge.

In handling "no fault" claims, the insurer has no right to subpoena medical records.  The insurer depends solely upon what the claimant is willing to provide it.  In this case, plaintiff never even advised the "no fault" claims unit of Dr. Afrika Samdani, who was plaintiff's only treating physician for injuries related to the accident for the first year thereafter.

As such, Dr. Varriale and Dr. Brennan, in preparing their reports, did not have access to the discovery obtained in this litigation, including the deposition transcripts and, most important, the medical records from Dr. Samdani.

Also, in response to the Court's Order, the plaintiff's counsel sent a letter, dated July 3,

2012, on this same subject: namely, who retained Dr. Varriale and Dr. Brennan and what was

9

their function in this case.  The plaintiff's counsel's letter stated, in part, the following:

      We represent the plaintiff, Kerry Connolly, in the above matter.  I am respectfully submitting this letter in response to your Order of July 2, 2012 for clarification with respect to the medical reports of Dr. P. Leo Varriale and Dr. John J. Brennan submitted by plaintiff in opposition to defendant's motion for summary judgment.

      With respect to Dr. P. Leo Varriale, Ms. Connolly was directed by Peerless Insurance Company to be examined by Dr. Varriale by letter dated October 6, 2009 from MCN Medical Consultants Network, an organization which arranges independent medical evaluations ("IME"), and did so, in this case, at the request of Peerless Insurance.  A copy of the letter is annexed hereto as Exhibit "A" and shows that Peerless No-Fault Claim number for Ms. Connolly's claim is 403169680-01.

      With respect to Dr. Brennan, Ms. Connolly was directed by National Claims Evaluation, Inc., in June 2011 to report to Dr. Brennan for a No-Fault IME.  According to its website, National Claims Evaluation, Inc. of Jericho, New York is an independent medical evaluations firm specializing in arranging for IME's, providing "personalized service to insurance carriers, third party administrators and legal defense firms."  See www.natclaim.com.  The report of Dr. Brennan (Exhibit "Q" of the Attorney Declaration, dated November 28, 2011) references the same Peerless' No-Fault claim number for Ms. Connolly's claim 403169680 that is contained in Dr. Varriale's Report.

      Confirming that these doctors were hired by defendant are the emails annexed as Exhibit "B," between Lorraine Cosme, of Safeco, a member of the Liberty Mutual Group, as is Peerless Insurance, and Ms. Connolly regarding the IME to be conducted by Dr. Brennan on behalf of Peerless Insurance.  That e-mail correspondence notes the same Peerless No-Fault Claim number 40316980 that is on the medical reports of Dr. Varriale and Dr. Brennan.

      Both Dr. Varriale and Dr. Brennan examined Kerry Connolly at the request of Peerless Insurance Company and provided their written reports to Peerless Insurance Company.  Peerless Insurance Company, in turn, produced those medical reports to Plaintiff in response to Plaintiff's discovery requests in this action.

The Court further notes that the annexed MCN Medical Consultants Network letter to

Kerry Connolly dated October 6, 2009, states that, "this letter is to inform that Peerless Insurance

has requested the below listed examination(s) or diagnostic test(s) for Kerry Connolly," listing

Dr. P. Leo Varriale as the orthopedic surgeon.

After review of all these letters and records, the Court finds that Dr. Varriale and Dr. Brennan were retained to examine the plaintiff, Kerry Connolly, on behalf of agencies affiliated with the defendant Peerless Insurance Co. or its associated firms.  In any event, these two doctors were retained by affiliates of the Peerless Insurance Company to give their opinions on the nature and extent of the injuries sustained by Kerry Connolly in the automobile accident of October 13, 2007.  Neither doctor treated the plaintiff.  Neither doctor was retained by plaintiff's counsel and both reported to entities using the same insurance company claim number.

There is no doubt that these doctors were brought into this case by affiliates of the defendant Peerless Insurance Co.  Regardless of whether Peerless itself retained these doctors, they could both be viewed as impartial physicians or retained by a company with ties to defendant Peerless Insurance Company.  Certainly, they could not be viewed as favoring the plaintiff in any manner.

Significantly, these two doctors have, in part, verified the plaintiff's injuries.

On November 16, 2009, Dr. P Leo Varriale, the orthopaedic surgeon, examined the plaintiff on behalf of the Peerless affiliate.  In his report, he stated that Connolly had an injury of the right shoulder caused by the accident at issue.  In addition, Dr. Varriale believes further surgery is necessary.  His report states the following:

> Right shoulder.  There are positive signs of impingement at 90°.
> External rotation to 70° (80° normal), internal rotation 80° (90°
> normal).  Abduction is 110° (180° normal).  There is weakness of
> external rotation.  There is no tenderness about the shoulder.
> There is good strength of the biceps and triceps.

*     *     *     *     *

11

Diagnosis:
1. Right Shoulder impingement
2. Resolved cervical and lumbosocral strain

Causal Relationship: After performing a physical examination,
taking a complete history from the claimant and reviewing the
medical records, I believe the injuries are causally related to the
accident of October 13, 2007.

Treatment: There is no need for any further physical therapy. I
believe the claimant does require an arthroscopic surgery to the
right shoulder to resolve her impingement.

Following that examination by Dr. Varriale, there was a request for another examination

of the plaintiff by an orthopaedic surgeon. On July 14, 2011 Dr. John J. Brennan examined

Connolly, also on behalf of a Peerless affiliate. His report dated July 14, 2011 noted that it was

an orthopaedic examination with regard to a No Fault claim by Connolly. His physical

examination revealed that Connolly had 160° of a normal 180° of rotation of the right shoulder

and right external rotation was 65° of a normal 90°. In his detailed report to the carrier's

affiliate dated July 14, 2011, Dr. Brennan wrote:

Dear Sirs:

At your request, the above captioned claimant was examined in my office for evaluation of injuries sustained in a motor vehicle accident on October 13, 2007.

**History and subjective complaint:** The claimant is a 51 year old female who was a restrained passenger of a motor vehicle, which was struck from behind on October 13, 2007.  Immediately after the accident, she noted pain in her neck, right shoulder, lower back.  The pain was not severe enough to warrant going to the emergency room.  She ultimately saw a physician at her primary care provider's office, who is a podiatrist.  This doctor instituted a course of physical therapy.  Due to lack of improvement, she had an MRI of her shoulder and came under the care of Dr. Stephen Fealy.  She had further physical therapy, as well as a corticosteroid injection to the right shoulder which did not give her any substantial improvement.  Due to this lack of improvement, she had surgery on the right shoulder.  She currently has been receiving physical therapy to the shoulder two days per week, and takes Aleve on a near daily basis, as needed.  She continues to have some pain in her neck, which radiates down her left arm and some pain in the back, which radiates down the left leg.  She denied any specific prior history of pain or trauma to the neck, right shoulder or back.  She did have a history of left shoulder problems, she had left shoulder surgery in 2007.  With regard to her right shoulder, she does report stiffness, as well as, discomfort. She does occasionally have pain at night.

\*   \*   \*   \*   \*

**Imaging studies:** Available for my review today are the following imaging studies.  MRI of the lumbosacral spine dated August 29, 2008 demonstrating a small subligamentous central 1.5/SI disc herniation.  MRI of the right shoulder dated December 13, 2008 demonstrating partial thickness tear of the supraspinatous tendon and subacromial bursitis.  MRI of the lumbar spine dated December 16, 2009 demonstrated eccentric annular bulging to the left at L4/5 abutting the 1.5 nerve root small central disc protrusion at 1.5/S1.

**Impression:** Status post motor vehicle accident with posttraumatic right shoulder impingement and adhesive capsulitis, status post surgery and lumbar disc herniation and cervical spine injury.

13

Treatment to date has been reasonable, related and necessary.  Her injuries are causally related to her motor vehicle accident of October 13, 2007.  There is currently a mild partial disability. Prognosis is good.  There is no need for household help, special transportation, DME or further diagnostic testing.  The claimant is compliant with post surgical treatment.  The end result has not yet been achieved.  I do not expect the shoulder will be fully recovered until approximately one year after surgery.  Further treatment is indicated in the form of physical therapy 2 to 3 times per week for 4 weeks, followed by an active directed home exercise program. (Emphasis supplied).

So that this examining doctor, Dr. John J. Brennan, apparently on behalf of an affiliate of the defendant, also finds that on July 14, 2011, three years and nine months after the accident, the plaintiff has sustained a post-traumatic right shoulder impingement; adhesive capsulitis; a lumbar disc herniation and a cervical spine injury – all "causally related to her motor vehicle accident of October 13, 2007 "and that she has a "mild partial disability."

## V.  DISCUSSION

### A.  The Standards

Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  To grant the motion, the court must determine that there is no genuine issue of material fact to be tried.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct.

14

1348, 89 L.Ed.2d 538 (1986), or by a factual argument based on "conjecture or surmise," <u>Bryant v. Muffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991).  The Supreme Court teaches that "all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties differing versions of the truth at trial."  <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89, 88 S.Ct. 1975, 20 L.Ed.2d 569 (1968); <u>see</u> <u>also</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed2d 731 (1999).  It is a settled rule that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury not for the court on a motion for summary judgment."  <u>Fischl v. Armitage</u>, 128 F.3d 50, 55 (2d Cir. 1997).

In deciding a motion for summary judgment, the Court must view all of the evidence in the light most favorable to the non-moving party, here the plaintiff, and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255; <u>Vann v. City of N.Y.</u>, 72 F.3d 1040, 1048-49 (2d Cir. 1995).  Notably, "the trial court's task at the summary judgment motion stage of litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  <u>Gallo v. Prudential Residential Servs. Ltd.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994); <u>see</u> <u>Donahue v. Windsor Locks Board of Fire Comm'rs</u>, 834 F.2d 54, 58 (2d Cir. 1987) (holding that on a motion for summary judgment, the court "cannot try issues of fact; it can only determine whether there are issues to be tried").

In this case, involving the No Fault Law, the initial burden is on the defendant Peerless to establish a prima facie case that the plaintiff's injuries were not "serious" as defined in New

York Insurance Law § 5102(d).  <u>Gaddy v. Eyler</u>, 79 N.Y.2d 955, 956, 582 N.Y.S.2d 990, 991,

591 N.E.2d 1177, 1178 (1992).  If the defendant has met this burden, then the plaintiff must, by

competent proof establish that a "serious injury" exists.

**B.  <u>The Plaintiff's "Serious Injury" Claim</u>**

　　**1.  <u>The Relevant "Serious Injury" Law</u>**

New York's No-Fault Law precludes recovery for non-economic loss in auto accident

cases, except where the plaintiff has suffered a 'serious injury.'" <u>Molina v. U.S.</u>, 301 F. Supp. 2d

317, 320 (S.D.N.Y. 2004).  Pursuant to Section 5102(d):

> Serious injury means a personal injury which results in death;
> dismemberment; significant disfigurement; a fracture; loss of a
> fetus; permanent loss of use of a body organ, member, function or
> system; permanent consequential limitation of use of a body organ
> or member; significant limitation of use of a body function or
> system; or a medically determined injury or impairment of a non-
> permanent nature which prevents the injured person from
> performing substantially all of the material acts which constitute
> such person's usual and customary daily activities for not less than
> ninety days during the one hundred eighty days immediately
> following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d) (McKinney 2000).  Here, the plaintiff alleges injuries to her cervical

spine, lumbar spine and her right shoulder, all of which constitute a "permanent consequential

limitation" of those parts of her body.  The plaintiff also contends that all of these injuries have

caused a "significant limitation of those body parts."  Both of these medical  conditions are

alleged to be within the express language of the statute defining a "serious injury."

　　**2.  <u>The Alleged "Permanent Injuries"</u>**

Dr. Christopher Lutz, a certified expert in physical medicine and rehabilitation, rendered

his opinions after physical examinations, clinical evaluations, review of diagnostic tests, certified

MRIs of the lumbar and cervical spine and an electrodiagnostic test.  In the opinion of Dr. Lutz,

the motor vehicle accident of October 13, 2007 "was a substantial factor in causing the plaintiff's

C6-C7 herniation."  Also, it was the opinion of Dr. Lutz that "the motor vehicle accident of

October 13, 2007 was a substantial factor in causing the plaintiff's L4-5 herniated nucleus

pulposis abutting the left L-5 nerve root with left L-5 radiculitis and the L5-S1 broad based disc

herniation."  (See Pltf's Exhibit I) .

    In addition, Dr. Lutz stated that the plaintiff's injuries were permanent:

    27.  It is my opinion within a reasonable degree of medical certainty that based on
my physical examinations. Clinical evaluations, the review of diagnostic tests
including the MRIs and electrodiagnostic test and the medical history, that Ms.
Connolly will continue to experience episodic and chronic lower back and neck
pain requiring further physical therapy, medications, steroid injections, integrated
therapy and potentially surgical intervention.

    28.  Within a reasonable degree of medical certainty, it is my opinion that Ms.
Connolly's injuries are permanent, and are life-long in that she can expect to
experience years of pain, weakness and restrictions on motion.  It is my opinion
within a reasonable degree of medical certainty that Ms. Connolly can expect to
continue to have trouble sleeping because of the pain she is experiencing, may
experience difficulties concentrating on various tasks due to the pain, will be
restricted in range of motion which will limit her ability to perform routine
household, recreational and work-related tasks and that she may expect to
experience difficulties with the customary activities of daily living such as
walking up and down stairs, lifting items, prolonged sitting or standing and
exercise.  Her injuries are permanent in nature and the symptoms result in a
permanent consequential limitation of the use of  her neck and lower back which
will affect Ms. Connolly's usual and customary activities of daily living
throughout her lifetime.

    I declare under the penalty that the foregoing is true and correct.  Executed on
November 9, 2011.

(Pltf's Exhibit I).

    In addition, plaintiff submitted the report of radiologist David R. Payne, MD who

reviewed the plaintiff's MRI's.  Dr. Payne stated that the June 30, 2009 MRI demonstrated a

bulging disc at C-3-4.  Also, the MRI of December 16, 2009 showed a bulging disc at L3-4 and

other injuries; which are expected to worsen, as follows:

> "I have been asked to review 3 MR examinations performed in reference to the above matter.
>
> MRI of the cervical spine of 06/30/2009 demonstrates a bulging disc at C3-4 with thecal sac indentation.  At C5-6 and C6-7 there are central disc herniations with thecal sac indentation.
>
> MRI of the lumbar spine of 12/16/2009 demonstrates a bulging disc at L3-4, a left foraminal and parasagittal herniation impinging upon the originating left L5 root, and a central annular tear at L5-S1 indenting the thecal sac.
>
> An MRI of the right shoulder of 12/13/2008 demonstrates an insertional partial tear of anterior articular-sided fibers of the supraspinatus and adhesive capsulitis with circumferential capsular and rotator interval thickening and fibrosis, requiring physical therapy which is currently ongoing, despite arthroscopic surgery on 2/25/2011.
>
> CONCLUSION:
>
> Lumbar and cervical bulges and herniations resulting from the incident of reference create ongoing symptomatology which is expected to worsen and may culminate in surgery.  Shoulder symptomatology has already necessitated surgical intervention and is expected to worsen.  (Pltf's Exhibit O)."

Further, and of importance, Dr. John J. Brennan, the independent doctor apparently

retained by a Peerless affiliate, examined the plaintiff, reviewed the lumbar and cervical MRI's

and rendered an opinion that the spinal injuries were causally related to the accident.  As stated

above, his report contains the following conclusions:

> IMPRESSION: Status post motor vehicle accident with posttraumatic right shoulder impingement and adhesive capsulitis, status post surgery and lumbar disc herniation and cervical spine injury.  Treatment to date has been reasonable, related and necessary.  Her injuries are causally related to her motor vehicle

18

accident of October 13, 2007.  There is currently a mild partial
disability.  Prognosis is good.  There is no need for household
help, special transportation, DME or further diagnostic testing.
The claimant is compliant with post surgical treatment.  The end
result has not yet been achieved.  I do not expect the shoulder will
be fully recovered until approximately one year after surgery.
Further treatment is indicated in the form of physical therapy 2 to 3
times per week for 4 weeks, followed by an active directed home
exercise program.

(Pltf's Exhibit Q).  (Emphasis supplied).

In prior cases involving injuries to the plaintiff's lumbar and cervical spines, treating

physicians diagnosis of permanency was sufficient to raise triable issues of fact involving

"serious injury."  In Tregg v. Gradischer, 6 A.D.3d 525, 774 N.Y.S.2d 391 (2d Dept. 2004), the

rule was stated:

In opposition, the plaintiffs submitted medical evidence that they
each sustained herniated discs and decreased ranges of motion in
their lumbar and cervical spines.  The plaintiffs' treating physician
affirmed that the plaintiffs' injuries were permanent and casually
related to the subject motor vehicle accident.  This evidence was
sufficient to raise a triable issue of fact (see Toure v. Avis Rent A
Car Sys., 98 N.Y.2d 345, 746 N.Y.S.2d 865;  supra, Acosta v.
Rubin, 2 A.D.3d 657, 768 N.Y.S.2d 642).

See also Franco v. Supreme Poultry, Inc., 91 A.D.3d 818, 819, 936 N.Y.S.2d 915 (2d

Dept. 2012), a similar case decided recently, holding:

The plaintiff alleged, inter alia, that as a result of the subject
accident, he sustained certain injuries to his left shoulder.  The
defendants submitted competent medical evidence establishing,
prima facie, that the alleged injuries to the plaintiff's left should
did not constitute a serious injury within the meaning of Insurance
Law § 5102(d) (see Rodriguez v. Huerfano, 46 AD3d 794, 795).
In opposition, however, the plaintiff submitted competent medical
evidence raising a triable issue of fact as to whether the alleged
injuries to his left shoulder constituted a serious injury under the
permanent consequential limitation of use category or the
significant limitation of use category of Insurance Law § 5102(d)

> (see Perl v. Meher, 18 NY3d 208 *5).  Accordingly, the Supreme
> Court should have denied the defendants' motion for summary
> judgment dismissing the complaint.

The Court has reviewed the reports by the medical experts submitted by the defendant and finds that surprisingly, two of the doctors state that the plaintiff's injuries still present at the time of the examinations two years and three and one-half years after the accident, were sustained in the automobile accident.  In the Court's view, all of the medical reports cited above are substantial evidence of a sufficient showing of a "serious injury, namely (1) "a permanent consequential limitation of use of a body organ or member; and (2) "a significant limitation of use of a body function or system".  See N.Y. Ins. Law § 5102(d).

The Court notes that this situation – injuries corroborated by physician reports submitted by the defendant – is a rare occurrence.  However, it has happened in the past and, in those cases, has precluded an award of summary judgment to the defendant.  For example, in Luigi v. Avis Cab Co., Inc., 2012 WL 2125960 (2d Dept. June 13, 2012), the defendant's own examining physician found "the existence of a significant limitation in the left shoulder."  Also in Scott v. Gresio, 90 A.D. 3d 736, 737, 934 N.Y.S.2d 351, 352 (2d Dept. 2011), the same situation occurred as follows:

> Although the defendant asserted that those alleged injuries did not
> constitute a serious injury within the meaning of Insurance Law §
> 5102(d) (see Toure v. Avis Rent A Car Sys., 98 NY2d at 352;
> Gaddy v. Eyler, 79 NY2d at 955-656), his examining neurologist
> recounted, in an affirmed report submitted in support of the motion
> for summary judgment dismissing the complaint, that range-of-
> motion testing performed during the examination revealed the
> existence of a significant limitation of motion in the region see
> Walter v. Walch, 88 AD3d 872, 872 [2011]; Cues v. Tavarone, 85
> AD3d 846, 846-847 [2011]).

Similarly in Wedderburn v. Simmons, 95 A.D.3d 1304, 944 N.Y.S.2d 895 (2d Dept. June

1, 2012), the defendant's examining orthopedist reported "the existence of a significant

limitation in the (cervical) region".  Even through the defendant's orthopedist did not state that

the injury was from the accident at issue, it was held that "the defendant failed to meet his prima

facie burden."  Id.  See also, Scott, 90 A.D.3d at 736, 934 N.Y.S.2d at 351 (defendant's

examining neurologist reported "significant limitation of motion in the [lumbar] region"); Luigi,

2012 WL 2125160, at *1 (the defendant's examination physician found a significant limitation in

the plaintiff's shoulder, even though he found that the injuries were degenerative and not

causally related to the accident.  Held, the defendant failed to meet their prima facie burden);

Alexander v. Gordon, 95 A.D.3d 1295, 945 N.Y.S.2d 397, 399 (2d Dept. June 1, 2012)

(reversing a grant of summary judgment in the defendant's favor, in part due to evidence that

"range of motion testing by the defendant's examining orthopedic surgeon revealed significant

limitation in the regions").

        Further, only recently in Perl v. Meher, 18 N.Y.3d 208, 218, 936 N.Y.S.2d 655, 659, 960

N.E.2d 424, 428 (Nov. 22, 2011), the New York Court of Appeals, in a major no-fault decision,

stated that "a rule requiring 'contemporaneous' numerical measurements of range of motion

could have perverse results" and "potential plaintiffs should not be penalized for failing to seek

out, immediately after being injured, a doctor who knows how to create the right kind of record

for litigation.  A case should not be lost because the doctor who cared for the patient initially was

primarily, or only, concerned with treating the injuries.  We therefore, reject a rule that would

make contemporaneous quantitative measurement a prerequisite to recovery."  In Perl, the Court

further stated:

> Defendants in Perl claim that there was insufficient evidence of a
> causal connection between Perl's accident and his injury.  They

> assert that here, as in <u>Carrasco v. Mendez</u> (decided with <u>Pommells v. Perez</u>), defendants "presented evidence of a preexisting degenerative . . . condition causing plaintiff's alleged injuries, and plaintiff failed to rebut that evidence sufficiently to raise an issue of fact" (4 N.Y.3d at 579, 797 N.Y.S.2d 380, 830 N.E.2d 278).
>
> Defendants in <u>Perl</u> did indeed present evidence, in the form of a sworn radiologist's report based on an MRI, that Perl's injuries were "degenerative in etiology and longstanding in nature, preexisting the accident."  However, plaintiffs' contrary evidence, while hardly powerful, was sufficient to raise an issue of fact.
>
> &ast;   &ast;   &ast;   &ast;   &ast;
>
> The issue presented by this evidence, of course, is one of credibility, which is not for this Court to decide.

<u>Id</u>., 18 N.Y.3d at 218-19, 936 N.Y.S.2d at 660, 960 N.E.2d at 429.

In sum, the Court finds that there are triable issues of fact as to whether the plaintiff suffered a "serious injury".  Accordingly, the defendants motion for an order, pursuant to Fed. R. Civ. P. 56, granting Peerless summary judgment dismissing the complaint on the ground that the plaintiff did not suffer a "serious injury," is denied.

**C.  <u>As to the Plaintiff's Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing</u>**

In the complaint, the plaintiff's counsel raises the issue of the "implied covenant of good faith and fair dealing in the underinsured's policy".  This claim is based upon the allegation that the defendant insurance carrier completely ignored the plaintiff's claim and refused to negotiate her claim in good faith.  Here, the plaintiff seeks additional damages in this cause of action including loss of time from work, stress, annoyance and the costs of this litigation, all allegedly caused by the defendant's refusal to negotiate in good faith under the terms of the contract. These damages are referred to as consequential damages.  As stated in <u>Bi Economy Market, Inc.</u>

22

v. Harleysville Insurance Company of New York, 10 N.Y.3d 187, 195-196, 856 N.Y.S.2d 505,

510, 886 N.E.2d 127, 132 (2008), the rule as to these consequential damages is as follows:

> Furthermore, contrary to the dissent's view, the purpose of the
> contract was not just to receive money, but to receive it promptly
> so that in the aftermath of a calamitous event, as Bi-Economy
> experienced here, the business could avoid collapse and get back
> on its feet as soon as possible.  Thus, this insurance contract
> included an additional performance-based component: the insurer
> agreed to evaluate a claim, and to do so honestly, adequately, and
> most importantly promptly.  The insurer certainly knew that failure
> to perform would (a) undercut the very purpose of the agreement
> and (b) cause additional damages that the policy was purchased to
> protect against in the first place.  Here, the claim is that
> Harleysville failed to promptly adjust and pay the loss, resulting in
> the collapse of the business.  When an insured in such a situation
> suffers additional damages as a result of an insurer's excessive
> delay or improper denial, the insurance company should stand
> liable for these damages.  This is not to punish the insurer, but to
> give the insured its bargained-for benefit.
>
> *   *   *   *   *
>
> Consequential "damages," on the other hand, are in addition to the
> losses caused by a calamitous event (i.e., fire or rain) and include
> those additional damages caused by a carrier's injurious conduct–
> in this case, the insurer's failure to timely investigate, adjust and
> pay the claim.
>
> Therefore, in light of the nature and purpose of the insurance
> contract at issue, as well as Bi-Economy's allegations that
> Harleysville breached its duty to act in good faith, we hold that Bi-
> Economy's claim for consequential damages including the demise
> of its business, was reasonably foreseeable and contemplated by
> the parties, and thus cannot be dismissed on summary judgment.

Accordingly, the defendant's motion for summary judgment dismissing the cause of

action for consequential damages based on a breach of the convenant of good faith and fair

dealing, is denied.

23

## VI.  **CONCLUSIONS**

For the foregoing reasons, it is hereby

**ORDERED**, that the defendant's motion for an order, pursuant to Fed. R. Civ. P. 56, granting the defendant Peerless Insurance Company summary judgment dismissing the complaint on the ground that the plaintiff did not suffer a "serious injury," is denied, and its is further

**ORDERED**, that the defendant's motion for an order, pursuant to Fed. R. Civ. P. 56, granting the defendant Peerless Insurance Company summary judgment dismissing the cause of action for consequential damages based on a breach of the covenant of good faith and fair dealing, is denied, and it is further

**ORDERED**, that the parties and attorneys are advised that this case is set down for trial on August 7, 2012.

**SO ORDERED.**

Dated: Central Islip, New York
 July 10, 2012


_____*/s/ Arthur D. Spatt*_____
 ARTHUR D. SPATT
 United States District Judge